RAYMOND HAROLD JOHNSON *v.* STATE OF INDIANA.

[No. 476S106. Filed February 9, 1977.]

690

*John G. Bunner,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *Elmer Lloyd Whitmer,* Deputy Attorney General, for appellee.

DeBRULER, J.—Appellant was charged by indictment with kidnapping, Ind. Code § 35-1-55-1 (Burns 1975) and rape, Ind. Code § 35-13-4-3 (Burns 1975) in an assault upon a ten year old girl. Appellant filed a special plea of insanity and the trial court appointed two psychiatrists to examine him. After a trial by jury, appellant was convicted of both counts and sentenced to life imprisonment on each.

On appeal, appellant raises four issues: (1) whether the trial court erred in ruling that the victim's seven year old brother was competent to testify; (2) whether the trial court should have withdrawn submission of the case to the jury and declared a mistrial when the prosecutor asked a psychiatric witness whether appellant, if released, would "do this again"; (3) whether the trial court should have given appellant's tendered final instruction on the statute providing for a commitment proceeding following an acquittal by reason of insanity; (4) whether in-court identification of appellant by the victim, her brother, and a friend should have been suppressed because impermissibly suggestive pre-trial photographic displays tainted the witnesses' in-court identification.

## I.

Appellant objected to the testimony of the victim's brother, who was seven years old, on the ground that he was incompetent to testify. The trial court and parties conducted a voir dire examination of the child, the relevant portions of which follow:

[Direct examination]
"Q. Do you know what it means to tell the truth?
A. Yes.
Q. And do you know what it means to tell a lie?
A. Yes.
Q. What happens to you if you tell a lie?
A. You have to start all over.
Q. Will you get in trouble?
A. Yes.
Q. Do you know that today when we ask you some questions later on, that you have to tell us the truth?
A. Yes.
Q. And that you cannot tell us any lies at all?
A. Yes.
Q. Alright, will you do that? Will you tell us only the truth?
A. Yes.
Q. And you can't make anything up. Do you know what that means?
A. Uh. huh.
Q. And you won't do that?
A. No.

\* \* \*

[Cross-examination]
Q. You said that when you tell a lie, you have to start all over, what did you mean by that?
A. You have to start all over and do it again.
Q. Why is that?
A. Because I told a lie, if I did.
Q. So, if you tell a lie, you have to start all over again, is that right?
A. Yes.
Q. And you're in what grade?
A. Second.

\* \* \*

PRELIMINARY QUESTIONS BY THE COURT:
Q. You say if you tell a lie you have to start over again, and do what?
A. You have to go back, all the way back.
Q. And do what?
A. Start all over and tell it again.
Q. And tell what?
A. The truth."

The court overruled the objection and permitted the child to testify.

A statute, Ind. Code § 34-1-14-5 (Burns 1973), renders children less than ten years old incompetent, "unless it appears that they understand the nature and obligation of an oath." Appellant contends that the witness' answer that "you have to start all over" if you tell a lie indicates that he does not understand the nature and obligation of the oath.

This Court has construed the above statute on numerous occasions, and has never held that it requires the child to be able to define the term "oath." See *Lewis* v. *State,* (1976) 264 Ind. 288, 342 N.E.2d 859, 862; *Shipman* v. *State,* (1962) 243 Ind. 245, 183 N.E.2d 823. Rather in *Martin* v. *State,* (1969) 251 Ind. 587, 244 N.E.2d 100, we held that the statute is satisfied if the trial court can find: (1) that the child knows the difference between telling the truth and telling a lie, and (2) that the child realizes that he or she is under some compulsion to tell the truth.[1] The compulsion to tell the truth need not be fear of punishment.

In reviewing such a determination, we recognize that our examination of the transcribed record of the questioning cannot compare with the trial court's personal presence at the hearing as a basis for resolution of the issue. We, therefore, entrust this determination to the discretion of the trial court and will reverse only where we find clear error, where there is no evidence from which the trial court could have found that the child understood the nature and obligation of the oath. *Lewis* v. *State, supra; Martin* v. *State, supra; Shipman* v. *State, supra.* Here, the witness answers consistently profess the ability to distinguish the truth from lies. His answer "you have to start over" is not

---

1. In past cases we have accepted an understanding by the child that an oath is a "promise to God" as evidence that the child recognizes an obligation to testify truthfully. *Lewis* v. *State, supra.* However to require such a belief as a condition of competency to testify would be inconsistent with the Indiana Constitution, which provides "No person shall be rendered incompetent as a witness, in consequence of his opinion on religious matters." Art. 1, § 7.

indicative of the fact that he did not feel a compulsion to tell the truth. Properly paraphrased, the witness testified that if one lies, one should go all the way back, start over again, and tell the truth. As such, it indicates that the witness felt a compulsion to take back or recant the entire untruthful statement and to supplant it with the whole truth. Considered in context with statements surrounding it, the statement supports the trial court's determination.

Appellant also argues that the witness testified in a confused manner. This argument is not relevant to the issue of competency. As we said in *Martin* v. *State, supra:*

> "The qualification of the child as competent does not imply [he] will be a model witness, nor does it imply that [his] testimony will be supported by the other evidence. . . . None of those issues bears on [his] *competency* as a witness. An adult witness is not rendered incompetent because he makes inconsistent statements or has a suspected faulty memory. The statutory presumption of incompetence is overcome when the child demonstrates an understanding of 'the nature and obligation of an oath' and there is no further test." 244 N.E.2d at 103.

## II. and III.

During cross-examination by the State of Dr. Charles Crudden, a court-appointed psychiatrist, the prosecutor asked the witness, referring to appellant, "And if he's permitted to go free, will he do this again?" Appellant objected and moved for a mistrial. The trial court sustained the objection, overruled the motion, admonished the jury to disregard the question, and asked each juror whether he or she would heed the admonition.

Appellant, on cross-examination of Dr. Crudden, asked whether there were procedures available in Indiana to commit persons of unsound mind to mental institutions; the doctor replied that there were. The prosecutor inquired whether appellant had ever been committed before, and Dr. Crudden said that this offense had been committed while appellant was on "leave of absence" from the Evansville State Hospital. Ap-

pellant asked the witness whether he was familiar with a maximum security hospital in Westville, Indiana. The prosecutor objected to "the form of the question" and his objection was sustained. Appellant made no further attempt to elicit the information.

After all the evidence, appellant tendered a final instruction which set out verbatim the statute prescribing the procedure to be followed after an acquittal by reason of mental disease or defect, Ind. Code § 35-5-3.2-1 (Burns 1975).[2] The trial court refused this instruction.

Appellant tendered another final instruction, which was given, reading as follows:

"You are instructed that in your deliberations on whether or not the defendant was of unsound mind at the time of the alleged commission of the acts, you may not consider, discuss, or speculate as to what disposition would be made of the defendant, should you find him not guilty by reason of unsoundness of mind. This is not a proper consideration for you, but is solely the responsibility of the Court."

Appellant assigns as error both the refusal of the trial court to withdraw submission of the case to the jury and declare a mistrial, and the refusal of his tendered instruction on the statutory procedure. The facts set out above are relevant to each assignment, so we have combined them for consideration.

The prosecutor's original question, "And if he's permitted to go free, will he do this again?" is not objected to because of the suggestion that appellant's criminal behavior might be repeated. Such a question would be proper when insanity is at issue. *Twomey* v. *State*, (1971) 256 Ind. 128, 132, 267 N.E.2d 176, 179. Therefore, the State's suggestion that any error here is "dispelled" because the prosecutor was later allowed, without objection, to elicit Dr. Crudden's opinion that appellant would repeat this behavior, is without merit. Appellant's objection is that the question improperly suggests to

2. The statute requires a hearing to determine whether a defendant found not guilty by reason of mental disease or defect is "presently mentally incompetent and dangerous to himself or others." If such a finding is made, the defendant is referred to the Department of Mental Health for civil commitment proceedings.

the jury that if appellant were acquitted by reason of insanity, he would be "permitted to go free."

A defendant seeking to rely on the overruling of his motion for a mistrial must demonstrate that the question or remark complained of placed him in a position of grave peril, to which he should not have been subjected. *Dewey* v. *State,* (1976) 264 Ind. 403, 345 N.E.2d 842, 847; *White* v. *State,* (1971) 257 Ind. 64, 78, 272 N.E.2d 312, 320. Appellant attempts to meet this burden by the bare assertion that he does not believe that the trial court's admonition could erase the suggestion from the jurors' minds. The State points out the fact that the admonition was prompt and was accompanied by personal questioning of each juror to ascertain that he or she understood the warning. We also note that the question is ambiguous; it does not assert that appellant would be set free, but merely implies the possibility. This implication could be rebutted by appellant's cross-examination of Dr. Crudden, which revealed the existence of involuntary commitment procedures. Appellant's instruction that the jury should not concern itself with the disposition of appellant, should he be acquitted by reason of insanity, also weakens appellant's position.

Inasmuch as the trial judge is in a superior position to observe the effects of comments and instructions on jurors, as well as to observe witnesses, we accord deference to his ruling on motions for mistrial and reverse only upon a showing of clear error. *Dewey* v. *State, supra.* We find no such error in this case.

We also hold that appellant was not entitled to have the jury instructed on the statutory procedure to be followed upon a verdict of not guilty by reason of insanity. While a defendant is generally not entitled to an instruction on the consequences of a verdict of not guilty by reason of insanity, *Lockridge* v. *State,* (1975) 263 Ind. 678, 338 N.E.2d 275; *Coppenhaver* v. *State,* (1902) 160 Ind. 540, 67 N.E. 453, we recognize an exception where "an erroneous view of the law on the subject has been planted in [the jurors']

minds." *Dipert* v. *State*, (1972) 259 Ind. 260, 262, 286 N.E.2d 405, 407. In *Dipert* a prospective juror asked what the result of a verdict of not guilty by reason of insanity would be, and the prosecutor replied that the defendant would go "scot free." The trial court gave no instruction to the jury that the remark was incorrect or should have been disregarded. We held that the defendant was entitled to have the jury informed of the actual procedures followed through a curative instruction or statement by the court.

We will assume that the prosecutor's question "planted an erroneous view" in the jurors' minds, although we note the difference between the explicit statement in *Dipert* and the implication present in this case. Nonetheless appellant was not necessarily entitled to a final instruction describing the statutory procedure, but only to have the jury informed of the existence of such procedures. Appellant elicited the fact that such procedures are available from the witness, Dr. Crudden. He also tendered, and the trial court gave, the final instruction that the jury should not consider possible dispositions of appellant. These actions were sufficient to cure any erroneous views the prosecutor's question may have implanted with the jury. Therefore there was no error in not giving appellant's tendered instruction. Moreover that instruction, while undoubtedly a correct statement of the law, since it quoted the statute verbatim, is lengthy and might tend to confuse the jury and distract them from other final instructions. We believe the better course, when the jury has been misinformed as to the disposition of the defendant, is for the trial court immediately to instruct the jury as to the procedure followed in insanity acquittals in brief concise language such as that employed by the lower court in *Lockridge, supra,* 338 N.E.2d at 280.

## IV.

Appellant objected to the in-court identification of him by the victim, her brother, and their friend, as the product of an impermissibly suggestive pre-trial identification procedure.

Facts relevant to this issue are as follows: The victim, an eleven year old girl at the time of trial, her brother, the seven year old witness whose competency to testify was examined in part (I) above, and a friend, a girl nine years old at the time of trial, were swimming in a public swimming pool at Garvin Park in Evansville, on June 19, 1975. A man approached them and requested their help in finding his little boy. When the boy was not found in the pool enclosure, the three children accompanied the man in a search of the rest of the park. Garvin Park contains a small lake; Pigeon Creek flows near this lake at one point. The man asked the victim to accompany him around one side of the lake while the others searched the other side. The man took the victim down the banks of the creek and assaulted and raped her, then gave her a dollar.

The victim's mother, who had arrived to take the children home, learned what had happened and had park employees radio the police.

Detectives Hamner and Wolf of the Evansville Police Department were assigned to investigate the crime. They visited the children at the victim's home several times on the day of the rape and following days.

Detectives Hamner and Wolf testified that on June 20th, the day after the crime, they took photographs to the victim's home to exhibit to the children. The victim's mother and the friend's father were also present. Detective Hamner showed the photographs to each child in turn in the living room, while the other children waited with the parents and Detective Wolf in the kitchen. While the viewing was taking place the children in the kitchen were not permitted to confer. The detectives denied that they suggested to the children that a photograph of the rapist was among those shown. Detective Hamner testified that he told the children that they should select a photograph if they recognized the man who attacked the victim; that they were not required to pick a photo; and that they should be sure of their choice, since a mistaken identification could lead to the imprisonment of an innocent man.

The photographs themselves were in three sets: eight small black and white photographs, front and side view ("first set"); six color photographs, front and side view ("second set"); and forty-nine larger black and white photographs, front view only, in an album-type book ("book"). There was a photograph of appellant in each group; in the second set he appeared with his face bruised and bandaged with flesh-colored band-aids.

Each child was shown the sets of pictures in the order listed. After each had selected, the photographs were brought into the kitchen, where everyone involved had gone, and one of the officers remarked that all the children had chosen the same man (appellant).

The children's descriptions of the photographic exhibition differed in several respects from that of the detectives. All of the children agreed that the officers did not draw any particular photographs to their attention. The friend and brother both denied that the detectives indicated that the assailant's picture was included in those shown. The victim, in her deposition, which was introduced at trial, was asked, "Well, before you picked out his picture, did the police indicate to you that one of them was probably the man who did it?" To which the victim replied, "Yes, they said probably one are in it and probably some are not."

The children also all believed that different sets of the photographs were shown on different days, although both the detectives and the father of the friend were certain that all the photos were shown in one viewing on one day. The friend originally testified that she had picked out two photographs from the second set, and selected appellant's picture after hearing that the other children had selected photographs of the same man. She later clarified this statement, saying that she narrowed her choice to one photograph without "help" and that she heard one of the detectives tell her father that the children had identified the same man *after* she had completed her selection.

Both of the girls testified that they would recognize appellant in court without having seen the photographs; all three children were certain that they had picked the right man.

Appellant correctly asserts that it is error to allow a witness to identify the accused at trial when the court finds that a pre-trial identification procedure, including the display of photographs, is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil* v. *Biggers,* (1972) 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; *Norris* v. *State,* (1976) 265 Ind. 508, 356 N.E.2d 204. Appellant incorrectly contends that the inconsistencies between the accounts of the detectives and the children, and the "utter confusion" demonstrated by the children in court, requires the suppression of the identification. There was ample evidence from which the trial court could reasonably have determined that the procedure utilized in this photographic display was a model of propriety. The record on the whole does not support contentions that the detectives gave the children any indication that the display contained a photograph of the man who committed the crime, or that the children were encouraged to select one of the photographs.

The inconsistencies and confusion alluded to by appellant can be attributed to the ages of the witnesses, seven to eleven years, their inexperience in the courtroom and lack of familiarity with police investigative practices, and the shocking nature of the crime to which they were witnesses. Both appellant and the State examined them almost exclusively by leading questions,[3] and the children sometimes agreed to contradictory statements. At any rate, inconsistencies in the evidence on the issue of the suggestiveness of a photographic display do not automatically require suppression, although they may affect the weight to be given to the identification testimony.

One point raised by appellant which merits discussion concerns the color photograph of appellant in the second set

---

3. It is, of course, proper to lead young witnesses, subject to the trial court's discretion.

shown to the children. Appellant's face appears bruised and is bandaged with three flesh-colored band-aids. No other photograph in any of the sets shows anyone with injuries to his face. Whenever possible, photographs included in an exhibit should be reasonably similar to one another. However, we note that when this photograph was exhibited to each child, that child had already identified a black and white photograph of appellant without injuries. This fact, and the fact that the injuries were of no special significance to the children, lead us to conclude that the display was not unduly suggestive.

There being no error, the conviction is affirmed.

Givan, C.J., Hunter and Prentice, JJ., concur; Arterburn, J., not participating.

NOTE.—Reported at 359 N.E.2d 525.