Jordan WEAVER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–9212–CR–606.

Court of Appeals of Indiana,
Second District.

Jan. 18, 1994.

Rehearing Denied Feb. 24, 1994.

John F. Crawford, Indianapolis, for appellant-defendant.

Pamela Carter, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Office of Attorney General, Indianapolis, for appellee-plaintiff.

SHIELDS, Judge.

Jordan Weaver appeals his convictions of attempted murder,[1] a class A felony; confinement,[2] a class B felony; battery,[3] a class C felony; two counts of battery,[4] a class A misdemeanor; resisting law enforcement,[5] a class A misdemeanor; and criminal mischief,[6] a class A misdemeanor. We affirm in part and reverse in part.

## ISSUES

Weaver raises four issues for our review; three are dispositive.

1. Is the evidence sufficient to support Weaver's conviction of attempted murder?

2. Did the trial court err in excluding the opinion of an expert witness until after Weaver testified when the opinion was based on Weaver's out-of-court statements to the expert?

3. Did the trial court err in admitting evidence of Weaver's bad character?

## FACTS

On the afternoon of April 2, 1991, Jordan Weaver took two "hits" of LSD. Weaver was feeling the effects of the drug very heavily when his girlfriend, Wendy Waldman, picked him up at a friend's house later that day. During the evening, Wendy and Weaver met some acquaintances of theirs, Kurt Steigerwald, Kris Hettle, Jessica Godley, and Tracie Glanzman. Wendy told the group she was worried about Weaver because he was "tripping" on LSD and was acting very oddly. The group decided to take Weaver to a secluded place, the Alverna Retreat, to keep him out of trouble.

Once at the Retreat, Weaver's behavior was very erratic. He began arguing with Wendy when she tried to get him to sit down.

He wrestled with Kurt, kissed or licked his neck, and bit Wendy's finger when she tried to separate the two of them. Weaver kissed Jessica and then tried to strangle her, calling her Wendy. Kurt hit Weaver with a tire jack, and then Kris put him in a choke hold to get him away from Jessica. The group unsuccessfully tried to restrain Weaver and lock him in the trunk of the car to take him to the hospital, and even considered hitting him with the car in order to stop him. Weaver then attacked Wendy, repeatedly slamming her head into the pavement and kicking her; the rest of the group drove away to get help.

As he tried to drive away from the Retreat, Weaver crashed Wendy's car, turning it over on its side. He then made his way to a nearby neighborhood and jumped through the closed bay window of the house owned by Barbara and Michael Blickman. Mr. Blickman hit Weaver over the head with a chair and then with a chair leg; a scuffle then ensued between Weaver and the Blickmans which progressed out into the Blickmans' driveway. The police arrived and, after a struggle, placed Weaver under arrest.

## I.

■ Weaver argues the evidence is insufficient to sustain his conviction of the attempted murder of Wendy Waldman. Specifically, Weaver argues that the State failed to disprove his defense of voluntary intoxication. We agree.

Ind.Code 35–41–3–5 (1988) provides that voluntary intoxication is a defense only to the extent that it negates the intent element of an offense, in this case the intent to murder Wendy. *See Ferguson v. State* (1992), Ind., 594 N.E.2d 790, 792. The defendant has the burden of establishing a factual predicate for the defense of voluntary intoxication. Specifically, Weaver had the burden of presenting evidence of intoxication " 'that, if believed, is

---

1. *See* IC 35–42–1–1 (1992 Supp.); IC 35–41–5–1 (1988) (attempt statute).

2. *See* IC 35–42–3–3 (1992 Supp.).

3. *See* IC 35–42–2–1 (1988).

4. *See id.*

5. *See* IC 35–44–3–3 (1988).

6. *See* IC 35–43–1–2 (1992 Supp.).

such that, [sic] it could create a reasonable doubt in the mind of a rational trier of fact that the accused entertained the requisite specific intent.'" *Fowler v. State* (1988), Ind., 526 N.E.2d 1181, 1182 (quoting *Williams v. State* (1980), 273 Ind. 105, 402 N.E.2d 954). Here, Weaver clearly met this burden, as there is ample evidence that, at the time he assaulted Wendy, Weaver was extremely intoxicated from the two hits of LSD he had taken earlier that day and that he had exhibited erratic behavior over the course of the evening. Thus, the State had the burden of establishing beyond a reasonable doubt that the defendant was not so intoxicated as to negate his ability to form the required intent. *Powers v. State* (1989), Ind., 540 N.E.2d 1225, 1227. Whether the State has met that burden is a question of fact for the jury, *Tata v. State* (1986), Ind., 486 N.E.2d 1025, 1027, and, as with any sufficiency question, we will uphold the jury's determination if there is evidence of probative value from which a reasonable trier of fact could infer beyond a reasonable doubt that Weaver was not too intoxicated to form the intent to murder Wendy. *See Isom v. State* (1992), Ind.App., 589 N.E.2d 245, 246–47, *trans. denied.*

In order to determine whether the jury could reasonably have found that Weaver had the intent to commit murder when he attacked Wendy, we must look at the evidence of Weaver's behavior just before, during, and just after the attack. We will examine this evidence in light of the general proposition that "a defendant should not be relieved of responsibility when he was able to devise a plan, operate equipment, instruct the behavior of others or carry out acts requiring physical skill." *Terry v. State* (1984), Ind., 465 N.E.2d 1085, 1089.

The record contains uncontroverted evidence that Weaver took two "hits" of "thick" LSD [7] in the afternoon of April 2, 1991, and was experiencing an "extreme trip" by the time Wendy picked him up that evening. In fact, the effect of the LSD was so strong that he told Wendy he did not think he was able

to go out with her that evening. Weaver nevertheless went to a restaurant with Wendy. Once there, Weaver was incapable of reading the menu and ordering; instead, he gave the waitress money before either he or Wendy had ordered, then said he was not hungry, prompting Wendy to "make up an excuse to get out" of the restaurant. Record at 598. A short time later, Wendy and Weaver met up with Kurt Steigerwald, Kris Hettle, Jessica Godley, and Tracie Glanzman. Kurt described Weaver's appearance at that time as follows: "he looked pretty dazed out, he didn't act normal ... it didn't seem to me that he had any idea what was really going on." *Id.* at 429. The group decided to take Weaver to the Alverna Retreat because he "was not in the right state of mind and we really didn't want him to get in trouble.... We basically wanted somewhere away from people, kind of quiet, for his own protection." *Id.* at 432.

Once at the Retreat, Weaver refused to sit down with the others and began arguing with Kurt and Wendy. He then "came over and basically laid on top of" Kurt, *id.* at 401, and began kissing or licking Kurt's neck. When Wendy tried to help Kurt, Weaver bit her fingers; Kris, Kurt, and Weaver then struggled on the ground, with Weaver finally hitting Kurt in the eye. Weaver then got into Kurt's car next to Jessica, whom he kissed. He then began choking Jessica, calling her Wendy and threatening to kill her. Kris and Kurt hit him twice on the head with a tire jack in order to stop him, but this had no effect on Weaver. Kris and Kurt finally got Weaver off of Jessica by putting him in a choke hold and throwing a blanket over him.

At this point, the group decided to take Weaver to the hospital because they thought he was "overdosing." *Id.* at 510–11. They tried to restrain him by locking him in the trunk of the car; however, they were unsuccessful. In fact, Weaver was in such a frenzy that they considered hitting him with the car to stop him. However, before they could restrain him, he attacked Wendy. After the attack, he apparently tried to drive away

---

**7.** The record indicates that LSD is sold in doses, called "hits," which consist of small squares of paper dipped in LSD. The LSD Weaver took on the day in question was "tripple dipped" and "thicker" than usual, meaning that each "hit" contained more LSD than a normal "hit" would.

from the Retreat in Wendy's car, which had been left running by the others. However, he went only a short distance before hitting a bush and overturning the car; it appears that he then got out of the wrecked car by kicking through the windshield. Weaver somehow made his way on foot to a nearby neighborhood, where he jumped through a closed window into the home of Michael and Barbara Blickman. Once inside, Weaver walked toward Mr. Blickman, who hit him over the head with a chair and then tackled him to the floor. As the two men struggled on the floor, Mrs. Blickman hit Weaver in the back with a chair leg; Weaver shouted obscenities at Mrs. Blickman. The struggle finally ended outside on the Blickmans' driveway, where Weaver was arrested by police officers who had been called to the scene.

Dr. Michael Evans, a toxicologist who interviewed Weaver regarding his experiences on the night in question, testified that, based on his conversation with Weaver, Weaver was experiencing "a bad trip, [an] acute psychotic reaction." *Id.* at 1605. Dr. Evans testified that during a "bad trip"

> the person begins to lose contact with reality and in a sense of not only seeing these things [hallucinations], but they can't distinguish reality from what they're seeing and envisioning. It no longer becomes a trip. They no longer are observing it, they are part of it.... [Y]ou lose sense of reality. It alters your perception so much that you lose reality.

*Id.* at 1589.

"The basic presupposition upon which the [voluntary intoxication] defense rests is that intoxication can be so severe as to render a person incapable of forming or entertaining the criminal intent required to commit a crime, yet not so severe as to render such person incapable of the conduct required to commit the crime." *Street v. State* (1991), Ind., 567 N.E.2d 102, 104. Thus, the fact that Weaver was physically able to attack Wendy, somehow get from the Alverna Retreat to the Blickmans' neighborhood, and struggle with the Blickmans is simply not sufficient evidence to disprove his intoxication defense, which involves the question of mental incapacitation because of intoxication. We see nothing in the evidence of record from which a jury could reasonably find that Weaver was capable of forming the intent to kill when he attacked Wendy. For example, there is no evidence that Weaver committed any acts of "physical dexterity and mental calculation" similar to those which have been found sufficient to disprove the defense of voluntary intoxication in other cases. *See, e.g., Gregory v. State* (1989), Ind., 540 N.E.2d 585, 594 (defendant got ladder from garage, climbed up to his mother's bedroom window, unlatched window, climbed in and stabbed his mother); *Gibson v. State* (1987), Ind., 516 N.E.2d 31, 33 (defendant denied taking part in robbery, left stolen goods behind in an abandoned house, and tried to escape); *Boze v. State* (1987), Ind., 514 N.E.2d 275, 279 (defendant pulled out a knife, threatened police officer, ran through woods and hurdled a fallen tree in attempt to escape); *Gambill v. State* (1985), Ind., 479 N.E.2d 523, 530 (defendant walked several blocks, broke into two cars, stabbed victim, got a $2 \times 4$, returned to the scene and beat victim with it, hid knife on roof of building, destroyed victim's wallet, and ordered his accomplice to return to the scene with a broom and remove their footprints in the snow); *Lewellyn v. State* (1988), Ind.App., 523 N.E.2d 768, 769 (defendant took gun from guncase, pumped gun and shot someone, then walked to a friend's house to elude police). In each of these cases, there was evidence from which the jury reasonably found that the defendant formed a plan of action and carried it out; there is no such evidence here.

There is no doubt that Weaver was acting under the influence of LSD, and none of his actions indicate that he was able to devise a plan, operate equipment, instruct the behavior of others or carry out acts requiring physical skill. Further, we are obligated to honor the legislature's judgment that voluntary intoxication ought to relieve a defendant from criminal liability under certain circumstances, that is, when the defendant's intoxication prohibits him from forming the requisite mens rea. Our review of the facts of this case has convinced us that if the defense of

voluntary intoxication does not apply as a matter of law here, it is an illusory defense.

The State failed to carry its burden of disproving Weaver's voluntary intoxication defense, and his conviction of attempted murder must be reversed.[8]

## II.

■ Weaver next argues the trial court erred in precluding the testimony of his expert witness, toxicologist Dr. Michael Evans. The State objected to this testimony, arguing that Dr. Evans could not testify before Weaver did because Dr. Evans's opinions were based on Weaver's statements to him concerning Weaver's feelings and experiences on the night in question. Weaver argues the statements were admissible to show the basis for Dr. Evans's expert opinion.

This court rejected an argument similar to Weaver's in *Briney v. Williams* (1968), 143 Ind.App. 691, 695, 242 N.E.2d 132, 134. The court in *Briney* stated:

"The weight of authority supports the rule that the opinion of a physician or surgeon based wholly or partly on statements and subjective symptoms related to the physician by the patient is inadmissible where the examination was made for the purpose of qualifying the physician or surgeon to testify as a medical expert."

We believe Indiana should follow this majority position, for to do otherwise would allow the patient's self-serving declarations to be carried to the jury and bolstered by the "expert's" opinion.

*Id.* (quoting 51 A.L.R.2d 1065); *see also Lee v. Schroeder* (1988), Ind.App., 529 N.E.2d 349, 354, *trans. denied* ("Admissibility has been rejected where the medical opinion of a non-treating physician is based in whole or in part upon the subjective hearsay statements of the patient.").

Here, Dr. Evans testified that, in his opinion, Weaver was suffering from a "bad trip" or an "acute psychotic reaction" to LSD on the evening of the attack. Record at 1605.

Dr. Evans based his conclusion on two interviews during which Weaver related his feelings and experiences on the night of the attack, and on a hospital report which confirmed that Weaver had LSD in his system after his arrest. At the time he talked to Dr. Evans, Weaver knew that Dr. Evans had been asked by his attorney to interview Weaver with the hope that he would testify at trial on Weaver's behalf. Therefore, without Weaver's foundational testimony, Dr. Evans's opinion testimony would have served as a conduit for Weaver's "story" without affording the State the opportunity to challenge the veracity and accuracy of that story by cross-examining Weaver.

The trial judge properly precluded Dr. Evans's testimony regarding the information he received from Weaver until that evidence was placed on the record by Weaver's own testimony.

## III.

■ Weaver finally argues the trial court erred in admitting evidence of his "bad character" through the testimony of Wendy Waldman and her mother. Specifically, he objects to Mrs. Waldman's testimony that he had no moral values, that he saw nothing wrong with drinking and driving, and that he did not think finishing high school was important, and Wendy's testimony that she and Weaver "were brought up in different ways and we had different morals and standards" and that "I rated school my first priority and I don't think he did." Record at 578.

■ Evidence of a defendant's bad character is not admissible to prove that the defendant's character is such that he was more likely to engage in the criminal acts charged; that is, he is a bad person and, therefore, more likely to be guilty. *Byrd v. State* (1992), Ind., 593 N.E.2d 1183, 1185; Fed. R.Evid. 404(a). Here, however, the evidence was relevant and was admissible to demonstrate the conflicts which occurred between Weaver and Wendy Waldman throughout their relationship, conflicts which often cen-

---

8. Weaver also argues the trial court erred in excluding Wendy's testimony that she believed Weaver attacked her only because he was on LSD and therefore he did not intend to kill her. As the excluded evidence relates to Weaver's involuntary intoxication defense, we need not decide this issue in light of our resolution of Issue I.

tered on Weaver's views regarding school and drugs and which, the State argued, gave Weaver a motive to kill Wendy. Thus, the evidence was relevant beyond its implication that Weaver was a person of bad character, and was properly admitted. Furthermore, in light of Weaver's own testimony that he and Wendy argued about drinking, drugs, and school and that he used drugs and dropped out of high school, and the fact that Wendy had been brutally beaten by Weaver, we must conclude the evidence about which he complains was not unduly prejudicial and could not constitute reversible error. *See Davis v. State* (1988), Ind., 520 N.E.2d 1271, 1274.

Judgment of conviction of attempted murder reversed; in all other things, the judgment is affirmed.

SULLIVAN, J., concurs.

SHARPNACK, C.J., concurs and dissents, with separate opinion.

SHARPNACK, Chief Judge, concurring and dissenting.

I concur with the majority resolution of the issues designated by it as numbers 2 and 3. I respectfully dissent as to the resolution of the issue of the defense of voluntary intoxication, upon which the majority reverses. Two aspects of the majority's treatment of this issue trouble me. First, I believe the majority depreciates the jury's determinative role in evaluating the facts on this issue. Second, I question the majority's use of the standard formulated in *Terry v. State* for determining when a defendant may not be relieved of responsibility for his acts.

At the outset, I recognize that this is a very difficult case to consider and that there is an abundance of evidence to support the conclusion that Weaver was under the influence of LSD during the time that the material events occurred. I also agree with the majority analysis of the applicability of the defense of voluntary intoxication as provided by I.C. § 35–41–3–5. However, where the majority finds "nothing in the evidence of record from which a jury could reasonably find that Weaver was capable of forming the intent to kill when he attacked Wendy," I

must disagree. I believe that the majority has inadvertently reweighed the evidence and, in the process, has discounted the evidence and inferences that reasonably could be drawn therefrom and from which the jury could have (and did) conclude that Weaver not only had the capacity to form the intent to kill Wendy but acted with that intent in his attack on her.

Without rehashing the evidence at length, it is clear that the evidence demonstrated that Weaver was able to walk without difficulty; was able to respond (albeit poorly) to threats, cajoling, and physical attacks; was able to get into the back seat of a car and attempt to throttle a girl in spite of being under attack at the time; was able to lift Wendy and hurl her to the ground, to kick her, and to bang her head on the ground; was able to get into Wendy's car and operate it in leaving the scene of his attack on her; was able, after the car overturned, to free himself from the car by kicking out the windshield; was able to make his way to and into the Blickman house, struggle with the Blickmans, and respond with verbal abuse to Mrs. Blickman's exhortations; and was able to continue the struggle with the police when they arrived.

There was also evidence that Weaver's recollection of the events was more complete at the hospital than when he testified at trial. The jury heard his testimony at length about the effects of an LSD "trip" and what he remembered of the night in question, which was in fair detail except as to the critical events. The jury also witnessed his apparent disorientation and inability to respond to questions after having testified at length and responsively. The jury was free to conclude that Weaver's apparent disability on the stand was not genuine.

There is no precise set of hoops that a defendant must jump through in order to have the capacity to form a criminal intent. It is the totality of the facts that is determinative. The issue is not whether LSD influenced Weaver's behavior. We know from our experience that alcohol and other drugs are influencing factors in many physical assaults. The issue is whether the influence of

LSD was enough to deprive Weaver of the ability to act with intent.

The jury reasonably could have concluded, for example, that Weaver was capable of intending to escape from the scene of his attack on Wendy, which could be seen as demonstrating his comprehension of the nature of what he had done, and was capable of getting into the car and starting off on his flight. If he had the capacity to intend and initiate that, he had the capacity to intend, for whatever distorted motive, to kill Wendy.

The jury was thoroughly and correctly instructed as to the law applicable to the case, including the defense of voluntary intoxication. The jury specifically requested more information about that defense and was reinstructed. A jury having heard and seen all the evidence in this case, having been properly instructed, and having conscientiously reached its verdict, ought not have an appellate court tell it that it got it all wrong.

The majority quotes *Terry v. State* (1984), Ind., 465 N.E.2d 1085, for the proposition that "a defendant should not be relieved of responsibility when he was able to devise a plan, operate equipment, instruct the behavior of others or carry out acts requiring physical skill." *Id.* at 1088. Since *Terry*, however, the Indiana Supreme Court has held that "where the evidence shows a defendant had the ability to engage offensively in physical combat, to disengage and leave the scene, and to find his way to a friend's home seeking aid, his intoxication was not so great as to relieve him from responsibility for his acts." *Ferguson v. State* (1992), Ind., 594 N.E.2d 790, 792 (citing *Hughett v. State* (1990), Ind., 557 N.E.2d 1015). This standard, which does not require that the defendant devise a plan or instruct the behavior of others, appears to focus the intoxication defense analysis on behavioral manifestations of intent rather than mental processes. I believe that the evidence supports the jury's verdict under either analysis, but especially so under *Ferguson* and *Hughett*.

In this difficult and tragic case, I would affirm.